COUNCIL OF CITY OF HAMTRAMCK *v.* HAMTRAMCK CITY CLERK.

MUNICIPAL CORPORATIONS—CALAMITY BONDS—STATUTES.

> Calamity bonds, issued by city to relieve distress of its inhabitants occasioned by widespread unemployment, remain calamity bonds, regardless of attempted mutation, may be in single or successive issues, but cannot, in aggregate amount, exceed the limit fixed by law (1 Comp. Laws 1929, § 2231, as amended by Act No. 14, Pub. Acts 1932 [1st Ex. Sess.]).

BUSHNELL and McALLISTER, JJ., dissenting.

Petition by Council of the City of Hamtramck for a writ of mandamus to compel Frank Matulewicz, City Clerk, to sign calamity bonds. Submitted June 16, 1938. (Calendar No. 40,159.) Writ denied June 30, 1938.

*William Cohen,* City Attorney (*Miller, Canfield, Paddock & Stone,* of counsel), for plaintiff.

*John Sklar,* for defendant.

WIEST, C. J. In *City of Muskegon Heights* v. *Danigelis,* 253 Mich. 260 (73 A. L. R. 696), we defined "calamity bonds," and I stand firmly by that decision.

"Calamity bonds" remain such, regardless of attempted mutation, may be in single or successive issues, but cannot, in aggregate amount, exceed the limit fixed by law.

I, therefore, concur in denying the writ.

BUTZEL, SHARPE, CHANDLER, and NORTH, JJ., concurred with WIEST, J.

POTTER, J. (*concurring*). The city council of the city of Hamtramck seeks mandamus to compel the city clerk of the city to sign so-called emergency bonds. The city clerk refused to sign them because of doubt as to the legality of the proposed bond issue.

Plaintiff, January 27, 1938, adopted the following resolution:

"That this council does hereby declare the present business depression to be a calamity affecting most of the people of the city of Hamtramck, and does hereby declare an exigency and emergency to exist involving the peace, health and safety of the city of Hamtramck."

February 25, 1938, plaintiff adopted a resolution authorizing the issue of $125,000 of emergency bonds for the relief of the inhabitants from distress due to the calamity of unemployment. Its action was taken under chapter 18, § 30, of the city charter, which provides:

"*In case of fire, flood or other calamity,* the council may borrow for the relief of the inhabitants of the city and for the preservation of municipal property, a sum, not to exceed *one-fourth of one per centum* of the assessed valuation of all real and personal property in the city, due in not more than three years, even if such loan would cause the indebtedness of the city to exceed the limit fixed in this charter."

This charter provision follows 1 Comp. Laws 1929, § 2231, the home rule act for cities.

Plaintiff does not mention 1 Comp. Laws 1929, § 2231, as amended by Act No. 14, Pub. Acts 1932 (1st Ex. Sess.) (Comp. Laws Supp. 1935, § 2231, Stat. Ann. § 5.2074), except in a supplemental statement filed after the hearing.

The right to issue the bonds in question "in case of fire, flood or other calamity" is somewhat indefinite. Where no intention to the contrary appears, general words used after specific terms are confined to things *ejusdem generis* with the things previously specified. *American Transportation Co. v. Moore,* 5 Mich. 368; *Hawkins* v. *Railroad Co.,* 17 Mich. 57 (97 Am. Dec. 179); *McDade* v. *People,* 29 Mich. 50; *Brooks* v. *Cook,* 44 Mich. 617 (38 Am. Rep. 282); *Macumber* v. *White River Log & Booming Co.,* 52 Mich. 195; *Roberts* v. *City of Detroit,* 102 Mich. 64 (27 L. R. A. 572); *People* v. *Shurly,* 124 Mich. 645; *Jacobs* v. *E. Bement's Sons,* 161 Mich. 415;

*Rogers* v. *Kuhnreich,* 247 Mich. 204.    The words "other" or "any other" following an enumeration of particular classes are, therefore, to be read as "other such like," and to include only others of like kind or character.    *Commonwealth* v. *Dejardin,* 126 Mass. 46 (30 Am. Rep. 652); *Wood* v. *Williams,* 142 Ill. 269 (31 N. E. 681, 34 Am. St. Rep. 79); *Rasure* v. *Hart,* 18 Kan. 340 (26 Am. Rep. 772); *Patton* v. *State,* 93 Ga. 111 (19 S. E. 734, 24 L. R. A. 732); *Benson* v. *Railway Co.,* 75 Minn. 163 (77 N. W. 798, 74 Am. St. Rep. 444); *Erwin* v. *Jersey City,* 60 N. J. Law, 141 (37 Atl. 732, 64 Am. St. Rep. 584); *People* v. *Richards,* 108 N. Y. 137 (15 N. E. 371, 2 Am. St. Rep. 373); *In re Barre Water Co.,* 62 Vt. 27 (20 Atl. 109, 9 L. R. A. 195); *City of Lynchburg* v. *Railroad Co.,* 80 Va. 237 (56 Am. Rep. 592); *Ripley* v. *Evans,* 87 Mich. 217.    Applying these general rules of construction to the words "or other calamity" contained in the charter, the applicable statute should be limited to calamities of the same general kind and character as those previously enumerated, such as cyclones, earthquakes, or other analogous causes resulting in the destruction of the property of the inhabitants of the city.    Were it not for the decision of this court in *City of Muskegon Heights* v. *Danigelis,* 253 Mich. 260 (73 A. L. R. 696), the writer would favor holding the charter and the statute has no application to cases of this kind.

Bonds were issued under the above charter provisions to the amount of $275,000, dated October 1, 1931, for relief from the calamity of unemployment at that time.    The assessed valuation of the city is $73,546,201.70.    So the proposed bond issue of $125,000 does not exceed the limit set by the charter of the city or by 1 Comp. Laws 1929, § 2231, as

amended by Act No. 14, Pub. Acts 1932 (1st Ex. Sess.), although if the former issue of $275,000 is counted, the total of the two issues would exceed both limits.

Facts and figures, it is urged by plaintiff, show that the situation confronting the city of Hamtramck is a calamity different and distinct from that for the relief of which the bonds dated October 1, 1931, were issued. We shall assume for the purposes of this case that this is so.

The city of Hamtramck refunded its entire bonded debt in pursuance of Act No. 13, Pub. Acts 1932 (1st Ex. Sess.), as amended by Act No. 143, Pub. Acts 1933 (Comp. Laws Supp. 1935, §§ 2705–1—2705–16, Stat. Ann. §§ 5.3201–5.3216) by issuing $1,530,143.37 refunding bonds, dated September 1, 1933, and payable September 1, 1963, with the option of redemption on any interest date; and by the exchange of such refunding bonds for the bonds outstanding. Said refunding bonds were issued in several series and the $275,000 of emergency bonds of 1931 were exchanged for a like amount of refunding bonds designated as series F and numbered 564 to 838, inclusive.

The city of Hamtramck again refunded its entire bonded indebtedness under Act No. 13, Pub. Acts 1932 (1st Ex. Sess.), as last amended by Act No. 42, Pub. Acts 1935 (Comp. Laws Supp. 1935, § 2705–1 *et seq.,* Stat. Ann. § 5.3201 *et seq.*), for the purpose of reducing the rate of interest, by the issuance of $1,527,850 refunding bonds, dated August 1, 1936, and payable serially on September first of each year from 1937 to 1963, inclusive. Refunding bonds of series F replacing the emergency bonds to the amount of $275,000, together with bonds of series G, H, I and J, were replaced by refunding bonds to the amount of $882,500 designated as series BB, num-

bered 544 to 1426, inclusive. The bonds of series BB were sold for cash and with the proceeds all bonds of series F, G, H, I and J were called, redeemed and retired. Refunding bonds of series BB, numbered 544 to 576, inclusive, to the amount of $32,500, became due September 1, 1937, and were paid.

On account of the city clerk refusing to sign the bonds proposed to be issued until their legality was determined by court decision, plaintiff asks a writ of mandamus compelling him to do so.

Plaintiff presents two theories to support the legality of the proposed bond issue: (1) that the charter provision for borrowing "not to exceed one-fourth of one per centum of the assessed valuation of all real and personal property in the city" for relief from "fire, flood or other calamity" does not limit to that amount the total amount that can be borrowed for several different calamities; and (2) that the emergency bonds of October 1, 1931, lost their identity as such and were merged by the refunding of the city debt in 1933 and 1936 and the payment of refunding bonds.

After the decision of *City of Muskegon Heights* v. *Danigelis, supra,* the legislature amended 1 Comp. Laws 1929, § 2231, by Act No. 14, Pub. Acts 1932 (1st Ex. Sess.), to read as follows:

"SEC. 4-a.   Each city may in its charter provide:
"(1)   For the borrowing of money on the credit of the city and issuing bonds therefor, for any purpose within the scope of its powers: *Provided,* That the net bonded indebtedness incurred for all public purposes shall not at any time exceed ten per centum of the assessed value of all the real and personal property in the city: *Provided further,* That in case of fire, flood or other calamity, the legislative body may borrow for the relief of the inhabitants of the city and for the preservation of municipal property,

a sum not to exceed three-eighths of one per centum of the assessed value of all the real and personal property in the city, due in not more than five years, even if such loan would cause the indebtedness of the city to exceed the limit fixed in its charter.''

This act not only increased the amount that might be borrowed by one-eighth of one per cent. of the assessed valuation, but extended the time for payment two years.

In plaintiff's charter and 1 Comp. Laws 1929, § 2231, and in the 1932 act above mentioned, *"a sum"* was authorized to be borrowed and not several sums. The proviso in each case states that this amount may be borrowed "even if *such loan*" increases the indebtedness beyond the charter limits. Nowhere is it intimated the legislature intended there might be several transactions with resulting increases beyond the charter provision for calamity relief. The limit fixed in the charter is eight per cent. of the assessed value, and not eight per cent. plus any number of one-fourth of one per cent. additions necessary to take care of new calamities as they arise, though plaintiff urges this as consonant with liberal construction.

There is a difference between liberal construction and misconstruction,—a judicial destruction of the legislative will to accomplish what may momentarily seem to be a desirable object. The charter authorizes borrowing in case of fire, flood or other calamity even if such loan causes the indebtedness of the city to exceed the limit fixed in its charter, but this authority does not authorize the city successively to exceed its borrowing limit even though it may allow its indebtedness to be one-fourth of one per cent. above the limit.

Doubt as to the powers of a municipal corporation must be resolved against the corporation. *United*

*States* v. *LePage* (C. C. A.), 59 Fed. (2d) 165; *City of Chicago* v. *Wonder Heating & Ventilating Systems,* 345 Ill. 496 (178 N. E. 192); *Federal Shipbuilding & Dry Dock Co.* v. *Bayonne,* 102 N. J. Eq. 475 (141 Atl. 455); *Van Eaton* v. *Town of Sidney,* 211 Iowa, 986 (231 N. W. 475, 71 A. L. R. 820); *American Aniline Products* v. *Lock Haven,* 288 Pa. 420 (135 Atl. 726, 50 A. L. R. 121); *Brink* v. *Village of Elmira Heights,* 139 Misc. 818 (249 N. Y. Supp. 378); *Williams* v. *Town of Dunnellon,* 125 Fla. 114 (169 South. 631).

In *L. A. Thompson Scenic R. Co.* v. *McCabe,* 211 Mich. 133, it is said:

"It should be borne in mind that the legislature of the State functions under broad constitutional limitations whereas the common council of the city of Detroit must act strictly within the powers granted to it in the charter," citing *City of Kalamazoo* v. *Titus,* 208 Mich. 252; Cooley's Constitutional Limitations (7th Ed.), p. 163 *et seq.*

See, also, *Thille* v. *Los Angeles Board of Public Works,* 82 Cal. App. 187 (255 Pac. 294); *Exter* v. *Kramer,* 316 Mo. 762 (291 S. W. 469).

"A statute conferring powers upon a municipality will be presumed to have been framed with reference to the rule that nothing is to be taken by intendment in construing a legislative grant of power." *Detroit Citizens' Street R. Co.* v. *City of Detroit* (syllabus), 110 Mich. 384 (35 L. R. A. 859, 64 Am. St. Rep. 350).

In *Attorney General, ex rel. Barbour,* v. *Lindsay,* 178 Mich. 524, it was said, in considering section 4, subd. b of the home rule act * for cities which provided that "when a city is authorized to acquire or operate any public utility, it may for the purpose of

---

* Act No. 279, § 4, subd. b, Pub. Acts 1907, as amended by Act No. 5, Pub. Acts 1913.—Reporter.

acquiring the same borrow money on the credit of the city in a sum not to exceed two per centum of the assessed value of all the real and personal property of the city.''

"I think it clear that the limitation of 8 per cent. is for general municipal purposes. If a city acquires a public utility, or acquires public utilities, it may, for that purpose, issue bonds not exceeding in amount 2 per cent. of the assessed valuation of the city. It may not issue bonds exceeding in amount 2 per cent. of the assessed valuation of the city to acquire any or all public utilities. Its power in this direction is limited to an issue of bonds not exceeding 2 per cent. of the assessed valuation. The total bonded debt for which the city is liable can in no case exceed 10 per cent. of the assessed valuation of the city.''

Mr. Justice Ostrander, in concurring in the court's construction of the two per cent. clause, said:

"Such construction, such interpretation, gives effect to all provisions of the law, and no other reasonable meaning can be gathered from the entire act. That, when compared with the maximum restriction upon the power to create a bonded debt, the restriction upon the issue of bonds to acquire public utilities seems inadequate is a consideration which has not been overlooked. The legislature has not expressed its will with desirable precision and certainty; but it is not the province of the court to amend the language or to supply omissions, if any have been made.''

The Hamtramck city charter has not been changed to utilize the broader power of borrowing money afforded by 1 Comp. Laws 1929, § 2231, as amended by Act No. 14, Pub. Acts 1932 (1st Ex. Sess.).

*City of Muskegon Heights* v. *Danigelis, supra,* was decided in February, 1931. When the legislature in 1932 changed the law and allowed a greater amount to be borrowed, for a longer period of time, it did not pluralize the words "sum" and "loan" in 1 Comp. Laws 1929, § 2231, as amended by Act No. 14, Pub. Acts 1932 (1st Ex. Sess.).

Calamity bonds are to be issued for a comparatively short time,—five years,—since 1932. This would seem to indicate it was intended there should be but *one issue* outstanding at one time.

The emergency bonds dated October 1, 1931, have not lost their identity or ceased to exist though now a part of the general debt of the city for the purposes of this case, though they may be merged in such refunding bonds for other purposes. Plaintiff states that where the element of repudiation or impairment of the obligation of contract does not enter, the courts recognize the difference between original and refunding bonds. And, likewise, this difference should be recognized when it is attempted to issue calamity bonds above the statutory limit.

In *Hively* v. *School City of Nappanee,* 202 Ind. 28, 34 (169 N. E. 51, 171 N. E. 381, 71 A. L. R. 1311), an attempt was made to evade the constitutional debt limit. It was said:

"The contract here, read as a whole, and considered together with the provisions of Acts 1927, chap. 223, leaves no doubt in the mind of the court that it was entered into for the purpose of evading the mandate of the Constitution, and, of doing indirectly, through the plan and through the corporation provided for by the act, that which could not be done directly. The law will look to the substance of the transaction regardless of its form or color."

Collection of the refunding bonds and the security lying back of them are not here involved.

Changing the form of an obligation does not change its purpose. Refunding bonds already issued is a change merely in the form of the obligation. *Port Huron* v. *McCall,* 46 Mich. 565. Such refunding bonds are not a new indebtedness. *Hirt* v. *City of Erie,* 200 Pa. 223 (49 Atl. 796); *Vaughn* v. *City of Corbin,* 217 Ky. 521 (289 S. W. 1104); *City of Poughkeepsie* v. *Quintard,* 136 N. Y. 275 (32 N. E. 764); *Hotchkiss* v. *Marion,* 12 Mont. 218 (29 Pac. 821).

"A bond is not an indebtedness or liability—it is only the evidence or representative of an indebtedness; and a mere change in the form of the *evidence* of indebtedness is not the creation of a new indebtedness within the meaning of the constitution." *City of Los Angeles* v. *Teed,* 112 Cal. 319, 327 (44 Pac. 580).

In *State, ex rel. Sherrill and Vann,* v. *Milam,* 113 Fla. 491, 534 (153 South. 100, 125, 136) it is said:

"In the instant case the indebtedness evidenced by the bonds retired with the proceeds from the refunding bonds still exists in so far as the amount thereof, and the liability of the drainage district therefor, is concerned; *but* it is evidenced by a new or different obligation or contract."

Plaintiff urges that Act No. 13, Pub. Acts 1932 (1st Ex. Sess.), as amended by Act No. 143, Pub. Acts 1933, under which the emergency bonds were refunded, contains in section 3 a provision which supports its position as to the effect of refunding on the debt limit. That section is as follows:

"Subject to the provisions of this act, any municipality may issue its refunding bonds, refunding notes or refunding certificates of indebtedness for the purpose of refunding any of its outstanding

funded indebtedness. Subject to the approval of the commission, any portion or all of its funded indebtedness may be refunded, in whole or in part, by one or more issues of refunding bonds, notes or certificates of indebtedness. The bonds, notes, certificates of indebtedness and tax levy herein provided for shall not be deemed to be within any statutory or charter limitation of tax rate or of bonded indebtedness, but shall be deemed to be authorized in addition thereto: *Provided,* That so long as the total debt of any municipality, including such refunding bonds, shall exceed any such limitation, no bonds except calamity bonds shall be issued for any other purpose.''

Plaintiff contends the existence of the refunded debt does not prevent or limit the issuance of calamity bonds. The statute makes no reference to statutory or charter limitations which, in this case, are eight per cent. according to the charter of the city. It is apparent that this charter limit is not eight per cent. plus any number of additions of one-fourth of one per cent. necessary to provide for fire, flood or other calamity relief. One purpose of the proviso was to recognize the provision for calamity bonds as being in addition to and not covered by the statutory or charter limitation upon bonded indebtedness. There is nothing to indicate any authorization to the city to issue such bonds in excess of the charter limitation on calamity bonds. The refunding act deals with refunding bonds and is only an aid to existing power. The emergency bonds issued October 1, 1931, have not lost their identity as evidence of indebtedness issued for calamity purposes. The charter limit of one-fourth of one per cent. for calamity relief limits the amount of money that may be borrowed for that purpose whether there is one or several calamities.

Writ of mandamus denied, without costs, a public question being involved.

McALLISTER, J. (*dissenting*). I am of the opinion that the writ of mandamus should be granted.

In *City of Muskegon Heights* v. *Danigelis,* 253 Mich. 260 (73 A. L. R. 696), this court said with regard to the issuance of such calamity bonds under 1 Comp. Laws 1929, § 2231:

"If the term 'calamity' is held to point solely to a disaster or catastrophe occasioning human distress, and, therefore, to exclude relief of acute misery arising from want occasioned by lack of employment, then the bonds are invalid. * * * We hold the term, as employed in the statute, is not limited to distress occasioned by physical forces, but extends to an overwhelming adversity, such as widespread inability to obtain employment and distress occasioned thereby."

Plaintiff's claim that the conditions in the municipality constitute a "calamity," as such has been defined by this court, is not denied.

The statute, above mentioned, provides for the issuance of such calamity bonds "even if such loan would cause the indebtedness of the city to exceed the limit fixed in its charter."

On October 1, 1931, bonds were issued by the municipality to the amount of $275,000 for relief from the unemployment and consequent distress at that time. The municipality refunded its entire bonded debt by the issue of refunding bonds dated September 1, 1933, payable 30 years from date thereof, and the outstanding bonds, including the calamity bonds, were exchanged for a like amount of refunding bonds. Later, the city again refunded its entire bonded debt by the issuance of refunding bonds

dated August 1, 1936, and payable serially on September first of each year from 1937 to 1963, inclusive.

The city charter provides that the net bonded indebtedness of the municipality shall not exceed 8 per cent. of the assessed value of all the real and personal property in the city.

The charter provides that "in case of fire, flood or other calamity, the council may borrow  *  *  * a sum not to exceed one-fourth of one per centum of the assessed valuation of all real and personal property in the city,  *  *  *  even if such loan would cause the indebtedness of the city to exceed the limit fixed in this charter."

The proposed bond issue of $125,000 does not exceed the limit set by the charter of the city for the issuance of calamity bonds, although if the previous issue of $275,000 be added, the total of the two issues would exceed the charter limit for the issuance of calamity bonds.

The emergency bonds dated October 1, 1931, have lost their identity as such by the refunding of the debt in 1933 and 1936.  The new bonds were exchanged for the calamity bonds with different rates of interest.  The latter issue of bonds was payable serially on September 1st of each year from 1937 to 1963, inclusive, instead of the 3-year period provided for in the calamity bonds.  The issuance of the redemption bonds evidenced a new and different obligation of contract as to rate of interest and period of redemption.

While the statute provides that the municipality, in case of calamity, may borrow a "sum" rather than "sums," it would seem that this provision would not limit the city in the issuance of calamity bonds for only one calamity.  The statutory provi-

sion should be construed to limit the sum to be borrowed in case of the occurrence of any one of the events enumerated, "fire, flood or other calamity," to one-fourth of one per cent. of the assessed value even if each loan causes an indebtedness in excess of 8 per cent. of the total valuation, as set by the city charter.

The fact that a disastrous fire occurs one year occasioning great public peril, should not preclude a municipality from the issuance of such bonds in case a flood should occur the ensuing year, occasioning similar public peril. As indicative of such intent and because of this supreme consideration for the peace, health and safety of the population and to protect them from widespread dangers and calamities, the statute provides for extreme measures in extreme cases, whatever and whenever the occasion, rather than the limitation of such assistance to one calamity in every five-year period, regardless of how many perils occur within that time. Whenever a great public calamity occurs, endangering the lives and the livelihood of the citizens, and occasioning misery and danger to the people, the municipality has the right to issue calamity bonds for the safety of its people. As was said in a somewhat similar regard in *City of Muskegon Heights* v. *Danigelis, supra:*

"This construction rightly accords to the members of the legislature humanitarian intent."

BUSHNELL, J., concurred with McAllister, J.